IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>DUSTIN JAY BOWMAN,<br><br>        Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS<br><br><br>Case No. 2:14-CR-114 TS |

This matter is before the Court on Defendant Dustin Jay Bowman's Motion to Suppress. The Court held an evidentiary hearing on Defendant's Motion on May 14, 2014. Thereafter, on August 11, 2014, the Court heard oral argument from the parties. Having considered the evidence presented and the arguments made, the Court is prepared to rule. For the reasons discussed more fully below, the Court will grant in part and deny in part Defendant's Motion to Suppress.

## I. BACKGROUND

A large fire occurred at an apartment building construction site in Salt Lake City on February 9, 2014. Due to the size of the fire and the extent of the damage, the National Response Team ("NRT") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") was involved in the investigation of the blaze. ATF Special Agent David Allen ("Agent Allen") is a member of the NRT and was a participant in the investigation.

Part of Agent Allen's role in the investigation was to conduct interviews with potential witnesses. On February 13, 2014, Agent Allen arranged a meeting with Chris Coons, the lead

electrician on the construction site to see if Mr. Coons could identify any of the individuals or vehicles observed in surveillance camera footage from the night of the fire.

Agent Allen met with Mr. Coons in a trailer at the construction site that served as the headquarters for the builder of the apartment building. Although Agent Allen merely requested to meet with Mr. Coons, the Defendant in this case—Dustin Bowman—also attended the meeting. Agent Allen showed Mr. Coons and Defendant still-frame pictures from surveillance video of the construction site. The still frames included several pictures that depicted an individual in a hooded sweatshirt. On two occasions Mr. Coons indicated that the person in the still images looked like the Defendant. Defendant denied being the person in the video.

Later that evening, Defendant sent Agent Allen the following text message: "This is Dustin Bowman. Electrician on new house construction site. Does your phone accept text? Can I meet with you on site Saturday at 7:00 am? I have information on the video I could not share with you in front of Chris. Please text return if we can meet."[1]

The next day, Agent Allen and Defendant arranged to meet in a Wendy's parking lot near the construction site. Defendant, Agent Allen, and ATF Special Agent Kent Owens met at the Wendy's parking lot shortly after 6:00 pm. At that time, Defendant informed the agents that he was the individual depicted on the surveillance video and that he had gone to the site on the evening of the fire to smoke a form of synthetic marijuana known as "spice." Defendant was cooperative with the agents and indicated that he could show them where he entered the construction site on the night of the fire.

Defendant drove a work van to the Wendy's restaurant and indicated that he could drive separately to the construction site. The agents communicated their preference that Defendant

---

[1] Plaintiff's Ex. 1, at 1.

ride with them in Agent Owens's vehicle as they were attempting to limit traffic near the scene of the fire. Defendant left his vehicle in the Wendy's parking lot and rode to the construction site in the front passenger seat of Agent Owens's vehicle. At the site, Defendant showed the agents where he had entered the perimeter fence and smoked spice next to a Conex lock-box that held the electricians' tools.

At the construction site, Defendant and the agents discussed the timeline of Defendant's arrival and departure from the site the night of the fire. Defendant stated that he had receipts and a public transportation schedule that could confirm his timeline. At that point, the agents indicated that they would like to continue their conversation with Defendant at the Salt Lake City Public Safety Building. According to Agent Allen, they wanted to go to the Public Safety Building because "[i]t was very dark and cold and noisy at the fire scene."[2]

Defendant was hesitant to accompany the agents to the Public Safety Building. The agents understood Defendant's hesitance to be related to his status as a drug user. With encouragement from the agents, Defendant agreed to accompany the agents to the Public Safety Building. Defendant and the agents traveled together in Agent Owens's vehicle to the Public Safety Building.

At the Public Safety Building, the agents and Defendant proceeded to an interview room on the third floor. The interview area of the Public Safety Building is considered a secured area. To arrive at the interview room, Defendant and the agents were required to pass through several locked doors. Once they arrived at the interview room Agent Allen stated to Defendant, "hey, so you know, I mean, you—you can walk out that door any time."[3] The door to the interview room

---

[2] Docket No. 31, at 31.

[3] Docket No. 35 Ex. 2, at 5.

was not locked and Agent Allen testified that Defendant could have walked back out of the secure interview area of his own volition at any time.

The interview room was roughly ten foot by ten foot square, with a table affixed to the wall on one side. Defendant was placed on the far side of the table, with Agent Allen directly across from him at the table and two other officers in the room. Due to the small size of the room, at least one of the officers was directly between Defendant and the door to the interview room.

Defendant's interview at the Public Safety Building began a little before 7:00 p.m. The first stage of the interview was handled by Agent Allen. Defendant was cooperative and expressed a willingness to discuss the night of the fire with Agent Allen. Agent Allen began the interview by asking general questions regarding the night of the fire and establishing a timeline for Defendant's activities that night. Defendant was cooperative and volunteered information.

Over time Agent Allen's questions became more direct and he focused on what he identified as inconsistencies between Defendant's version of events and the surveillance camera videos.

> Mr. Allen: So like I was saying, on the video, the time, you know, you're coming out—coming out of there, and the fire start—or the smoke is right after that.
> Mr. Bowman: Holy shit.
> Mr. Allen: Yeah. So are you sure you didn't see something or smell something?
> Mr. Bowman: I wish I fucking did. I didn't see anything.
> . . . .
> Mr. Allen: So I mean . . . Looking at those items, you know, it's not making sense. We need to—you know if you're worried about something, tell us, we'll talk about it. But we—we got to—
> Mr. Bowman: I'm not worried about anything other than the spice and the reason I was there.
> Mr. Allen: Right. It's just it's—it's not making sense at all.
> Mr. Bowman: I understand. I—I fully understand that. And I'm freaking the hell out right now.
> Mr. Allen: Well, what do you think's going to happen?
> Mr. Bowman: I have no idea.

Mr. Allen: You got to be—you got to be a hundred percent straight up with—with us.
Mr. Bowman: I am.
Mr. Allen: Otherwise—because you know how it looks to us.
Mr. Bowman: I—
Mr. Allen: It looks like crap.[4]

Agent Allen continued to point out inconsistencies in Defendant's version of events and encourage him to come forward with more information. At first, Defendant claimed that he did not enter the apartment building. Later Defendant admitted to entering the building but claimed that he quickly exited when he heard footsteps upstairs. Agent Allen confronted him on this stating, "there was nobody else in there. There's video all the way around it. And we know the security guard pulled in here and then pulled out, and didn't go in there."[5] Defendant responded, "I wish I had something for you. I really do. My God, I wish I did."[6] To which, Agent Allen once more stated, "I mean, it doesn't—it doesn't look good."[7]

Agent Allen appeared convinced that Defendant had to "do or see something."[8] He repeatedly encouraged Defendant "to be a hundred percent honest" with him.[9] Defendant continued to assert that he "heard somebody else there." [10] Agent Allen informed him that "there wasn't anybody else there."[11]

---

[4] *Id.* at 71–72.

[5] *Id.* at 73.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 76.

[9] *Id.* at 67; *see also id.* at 67, 72, 75, 101, 103, 134, 224.

[10] *Id.* at 74.

[11] *Id.*

Agent Allen eventually decided to take a break and asked the Defendant whether he was doing alright. Defendant responded, "I'm fucked."[12] Agent Allen then asked, "Well, what do you think's going to happen?"[13] Defendant responded, "I have no idea."[14] Shortly thereafter, Agent Allen once more asked, "Well, what do you think's going to happen? How are you fucked?"[15] And Defendant responded, "Obviously, I'm the last person there."[16]

Defendant went on to discuss his family and his grandmother whom he was supposed to meet the next day, but whom he now felt he would not be able to meet. Agent Allen then posed the question, "How do you think this is going to turn out?"[17] Defendant responded, "Me getting pounded in the ass by a big black guy named Bubba."[18] Agent Allen followed by asking, "do you think we're going to charge with you?"[19] To which Defendant responded, "I fucking swear I heard somebody go this way and in. And I swear I heard somebody upstairs when I was in the building."[20]

At that point, Agent Allen adopted a more aggressive approach. Agent Allen stated such things as: "[Y]ou saw who's out there, right?"[21] "Do you know how many agents they brought in for this?"[22] "You know everybody's working on it?"[23] "They've got—there's all these videos

---

[12] *Id.* at 93.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 94.

[16] *Id.*

[17] *Id.* at 98–99.

[18] *Id.* at 99.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 100.

[22] *Id.*

and so many people."[24]  "Because, let me tell you what, you know, there's always technology and evidence and 114 other witnesses, and these guys, they love doing fires."[25]  "They know fires.  You see how much work they've done, and they're going to dig out—they are insane.  I mean, they will pick out each little piece."[26]  "You know, and they have lab people and all sorts of stuff.  That's—that's what it is right?  And then all that other stuff."[27]  Agent Allen then insisted "you've got to tell them what happened.  It doesn't look good, because you have all this other stuff."[28]

Defendant answered, "I really wish I could give you more information."[29]  To which, Agent Allen responded, "Well, you got to, because otherwise—."[30]  And, "I'm telling you everything else tells a story. . . . And if your story is off, that's going to hurt you."[31]  Agent Allen later stated, "Dustin, they're going to say we know how the fire started."[32]  "And we know who started the fire."[33]  "They're not going to ever know why.  You got to tell me why.  What can I tell them why?  Because that's going to be huge."[34]  To which Defendant responded, "I don't know.  I don't know what."[35]  Agent Allen then asked, "You don't know why you did it?"[36]

---

[23] *Id.*

[24] *Id.*

[25] *Id.* at 101.

[26] *Id.*

[27] *Id.* at 102.

[28] *Id.*

[29] *Id.* at 106.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 108.

[33] *Id.* at 109.

[34] *Id.*

And Defendant responded, "I didn't do anything."[37] To which Agent Allen stated "That's—that's not how it's going to look."[38]

From that point in the interview, Agent Allen's questions assumed that Defendant started the fire that consumed the apartment building. Agent Allen asked such things as: "I don't think you were doing it for money. Were you doing it for money?"[39] And, "So the other things, you know, that people are going to think are, you know, that it was covering something up. This fire was there to cover something up."[40] To which Defendant responded, "Thirteen or fourteen homeless people buried in the concrete. But no, there's nothing."[41] Towards the end of Agent Allen's lead of the questioning, Agent Allen stated, "Fires—fires don't just magically appear."[42] "So it's going to be obvious and it's going to be—it's going to be Dustin. It's going to be all Dustin."[43]

Defendant continued to behave very cooperatively but also continued to deny any involvement in the fire. Defendant admitted to entering the apartment building and claimed to have come into the building to look for scrap wire to sell in order to obtain more spice. However, Defendant also continued to assert that he heard footsteps in the building and "as soon as [he] heard more footsteps, [he] left."[44] Eventually Agent Allen began to "get worked up" and

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 112.

[40] *Id.* at 116.

[41] *Id.*

[42] *Id.* at 137.

[43] *Id.* at 137–38.

[44] *Id.* at 140.

raise his voice.[45]  Agent Allen apologized to Defendant for this loss of composure and after approximately two hours of questioning excused himself from the interview room.  Defendant did not seem at all adversely affected by Agent Allen's loss of composure.

After Agent Allen left the room, Defendant asked for a bottle of water.  While one of the officers went to track down a bottle of water, Investigator Justin Poarch with the Salt Lake City Fire Marshal's Office entered the interview room.  Investigator Poarch took over the next portion of the interview.

Investigator Poarch had a more aggressive interviewing technique than Agent Allen. Throughout the first part of his questioning, Investigator Poarch discussed the alleged evidence and informants he had against Defendant.  In Investigator Poarch's words, "If there is anything else you want to talk about in there, I'm giving you the chance. . . .  Plain and simple.  Because the evidence that I've got stacked up against you."[46]  Investigator Poarch made clear to Defendant that "[a] hundred percent of this weight is on you."[47]  Investigator Poarch presented himself as "the ace . . . coming in here with this kind of information and . . . doing this kind of homework."[48]

Defendant was cooperative and willing to talk throughout Investigator Poarch's portion of the interview; however, Defendant did inform Investigator Poarch that Investigator Poarch was scary and asked that Agent Allen be brought back into the interview room.[49]  Investigator Poarch responded by asking whether it was alright if he was in the interview room, to which

---

[45] *Id.* at 141.

[46] *Id.* at 164.

[47] *Id.* at 167.

[48] *Id.* at 178.

[49] *Id.* at 175, 180.

Defendant answered in the affirmative stating, "Yes.  No, no, you need to . . . be in here.  You are required to be in here.  You and I are doing this interview right now.  Okay, this is you and me."[50]

Investigator Poarch agreed to have Agent Allen brought back to the interview room by stating, "Fair enough.  If we bring Dave in here and we talk to Dave, are you—are you okay with filling in the [twenty] percent?  And being honest."[51]  Defendant responded, "I think—I think we can talk."[52]

Agent Allen returned to the interview room and Investigator Poarch stated,

Okay.  So Dave, basically—I mean, you have a—you have a good rapport with him, that—you know, you guys have been working on some stuff.  But the information that I have is the remaining [twenty] percent.  I've got—like [eighty] percent of what I've got is pretty solid, you know what I mean, as far as . . . things that he's told us.  I've got this [twenty] percent part that he's—I've got six good people that are willing to—I mean, they're going to bury him.  So he is willing to not omit anything else, and tell us everything that happened in there, even if it's . . . you know, things go from bad to worse, whatever it is, straightforward, that can be accounted for.  And when I tell you that [twenty] percent, there's something that goes along with that, okay?[53]

Defendant responded, "Your [twenty] percent, as far as there being anybody else involved, there was nobody else involved.  Nobody asked me to start a fire.  Nobody paid me anything."[54]  "I did come here solely for one reason.  To get high."[55]  "Yes, I was getting high in

---

[50] *Id.* at 179.

[51] *Id.* at 175.

[52] *Id.*

[53] *Id.* at 182.

[54] *Id.* at 183.

[55] *Id.*

the building as well. Yes, I did ditch my roach. I was also smoking a cigarette in there. I ditched the cigarette. I left."[56]

Investigator Poarch then said, "Let's talk about—let's talk about you smoking your cigarette."[57] To which Defendant responded, "I'm fucked."[58] Investigator Poarch followed up with, "Let's talk about your cigarette in there, okay? Because there's a little more to it than that, okay? This is your chance."[59] Defendant then made his first admission to intentionally starting a fire in the apartment building.

> Mr. Bowman: I was trying to burn some wire.
> Mr. Poarch: Do you know how I know that?
> Mr. Bowman: And it got a little out of hand. And I couldn't stop it. And I got scared. I freaked the hell out because I was high and I didn't know what else to do.
> Mr. Poarch: Wire from what?
> Mr. Bowman: Fire alarm wire. Honestly, there was no one else involved.
> Mr. Poarch: Remember I told you I pulled for the underdog? Remember I told you I'm a fair guy? Because, guess what? I knew that.
> Mr. Bowman: I know you did.
> Mr. Poarch: And I appreciate you being honest about it. Want to talk about how you burned it?
> Mr. Bowman: Not necessarily.
> Mr. Poarch: I need you to. Because otherwise—we're up to about ten percent now. Because I can't not sit here and tell you what other people—
> Mr. Bowman: No, I know.
> Mr. Poarch: —are wanting you to do that.
> Mr. Bowman: I know. Really I—there was nobody else.
> Mr. Poarch: Okay.
> Mr. Bowman: I really did on my own. I wish to God the building didn't burn down . . . .[60]

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 184.

[60] *Id.* at 184–85.

The agents and Defendant then discussed the details of the method Defendant used to burn the insulation off of the fire-alarm wire. Defendant claimed that he used his lighter to start the fire on "[a] little bit of cardboard. And it wasn't working very well, and then just spread way too quick."[61] Defendant denied using any accelerants. He attested that it "was just garbage on the ground. One of them was a little Dottie, on cardboard—Dottie is a brand, electrical brand. It was a small Dottie box that I started. And it got out of control very, very quick."[62]

Investigator Poarch asked whether it was the insulation that got out of control and Defendant responded that it was "[t]he fire. And I stomped it for a second, and there was nothing I could do. I should have called 911. I was scared. I was high."[63] Defendant claimed that he lit the cardboard in three different places and "it was a pallet fire before I knew it."[64]

After thoroughly discussing how Defendant started the fire, Investigator Poarch asked Defendant to start over and walk him through the process from when Defendant came up the alley and through the gate. Defendant once more recounted how he came through the gate and went to the Conex lock-box to get high. At that point, Mr. Poarch stopped the recount and initiated the following exchange.

> Mr. Poarch: Let's do one more thing.
> Mr. Bowman: Yes.
> Mr. Poarch: Before we go any further. Okay. It's like in a—you've seen CSI?
> Mr. Bowman: Yes.
> Mr. Poarch: Right? You see—watch those shows, okay. So, you know, in that there's things they always talk about that, you know, you don't have to talk about this stuff if you don't want to, okay?
> Mr. Bowman: I want to.
> Mr. Poarch: Okay. You know, if there's anything that I'm questioning you or talking to you about, you know, you can say, I don't want to answer that.

---

[61] *Id.* at 187.

[62] *Id.*

[63] *Id.* at 187–88.

[64] *Id.* at 191.

Mr. Bowman: I understand.
Mr. Poarch: And at any time you can also say, I don't want to talk about this anymore.
Mr. Bowman: I understand.
Mr. Poarch: You have the right to have an attorney here.
Mr. Bowman: I do understand.
Mr. Poarch: You understand those things.
Mr. Bowman: I do.[65]

Investigator Poarch went on to inquire as to whether Defendant was under the influence of any drugs or alcohol. Defendant responded that he smoked some spice before coming in, but the officers determined that Defendant appeared to be alert and aware of the situation. Investigator Poarch asked if after being informed of those rights Defendant still wanted to talk. Defendant indicated that he did.

The agents and Defendant then went through the scenario once more. Investigator Poarch again asked whether Defendant had used an accelerant on the wire to burn the insulation off faster. The Defendant denied the use of any accelerant and stated, "I have nothing else to hide right now. I'm . . . [a]t this point . . . I'm behind bars and in jail."[66]

The agents continued to question individual details in Defendant's story and indicated that they now had ninety-five percent of the story. Defendant asserted that "[t]he only thing that [he] lied to [the agents] about was the facts that [he] went in the building and the fact that [he] unintentionally lit that fucker up."[67] At that point, Defendant attested that he had given them "a hundred percent of the story"[68] and "[u]nfortunately, that's the truth. It's my fault."[69]

---

[65] *Id.* at 192–93.

[66] *Id.* at 198.

[67] *Id.* at 201.

[68] *Id.*

[69] *Id.* at 202.

It is apparent that, at that juncture, Defendant fully understood the ramifications of his actions and his confession. In response to a question from Investigator Poarch as to whether he had burned down the building to hurt himself or others Defendant stated,

> No. And in fact, the fact that this building burnt to the ground, minus the legal ramifications, minus the fact that I'm probably going to jail for a long time now, let's—let's ignore all that, okay? Just the fact that I don't have this job site to work on. . . . Fucks me hard. . . . I mean so hard. And when this gets out, I'm not going to have a job anymore. I'm—I—if I were Dave I wouldn't work with me anymore. I'd fire my ass.[70]

Investigator Poarch then left the interview and a different officer provided Defendant a written version of the *Miranda* warnings for Defendant's review. The officer also asked Defendant to initial and sign the *Miranda* warning, which Defendant did. The same officer helped Defendant prepare a written statement reflecting his earlier account of how he started the fire that Defendant also signed. The agents also worked with Defendant to sign a consent form for the officers to search his phone and to recover the boots he wore the night of the fire.

Five hours after meeting the officers and after approximately four hours of questioning, Defendant was arrested and taken to the Salt Lake County Jail for booking.

The next day, February 15, 2014, Agent Allen, ATF Special Agent Paul Claflin, and ATF Special Agent Dixon Robin went to the Salt Lake County Jail to speak with Defendant. Agent Robin led the conversation and began by reading Defendant a full *Miranda* warning and providing Defendant a *Miranda* waiver form which Defendant signed.

The agents and Defendant discussed his account from the night before and Defendant admitted that he did not attempt to burn wire like he had previously stated. Defendant attributed his prior statements to his being "high as a kite" during the interview.[71] Defendant admitted to

---

[70] *Id.* at 210.

[71] *Id.* at 66.

lighting a small piece of cardboard on fire and tossing it down near a large tub box.  The agents

once more asked why he started the fire to which Defendant responded, "Why, I don't know.  I

was high as a kite, dude.  There's no reason in my head right now that it still makes sense that I

did it.  I still have no clue or understanding, the why.  I wish I did."[72]

The only reason that Defendant could finally give is that the fire department was there the

day before while he was working on the building and, in his altered state Defendant thought that

it would be ironic for the fire department to report back out to the building for a fire.  In

Defendant's words,

> Honestly, I didn't even think one or two apartments would be destroyed.
> Honestly, I thought maybe a char mark.  Maybe just a, oh, well, you know, that's
> kind of ironic, the fire department was here yesterday and they're planning on this
> and they're planning on that.  Oh, well, yeah, there's a fire.  Did—did I intend for
> the entire building to go up?  No.  Did I intend for more than one room or more
> than just a small thing to go up?  No, I didn't.[73]

A federal complaint was brought against Defendant on February 19, 2014, charging him

with one count of Arson Damaging a Building and Real and Personal Property Used in Interstate

Commerce, a violation of 18 U.S.C. § 844(i).  An Indictment charging the same was issued on

March 5, 2014.

## II.  DISCUSSION

Defendant now seeks "the suppression of all statements and/or confessions made by him

to law enforcement officers on February 14 and 15, 2014, as well as any evidence discovered or

obtained as a result of those statements."[74]  Defendant argues that suppression is merited because

the statements were obtained in violation of Defendant's Fifth Amendment rights because

---

[72] *Id.* at 56.

[73] *Id.* at 59.

[74] Docket No. 25, at 2.

Defendant was subjected to custodial interrogation without being provided *Miranda* warnings. The Government contends that Defendant's rights were not violated because Defendant (1) initiated contact with law enforcement, (2) was not in custody during questioning at the Public Safety Building, and (3) in any event, the statements made at the jail the second day followed a voluntary waiver of Defendant's *Miranda* rights.

"The Fifth Amendment to the U.S. Constitution guarantees that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'"[75]  Pursuant to the Supreme Court's holding in *Miranda v. Arizona*,[76] "a suspect's statements are generally inadmissible if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver."[77]  Law enforcement "officers need not administer *Miranda* warnings to everyone they question.  On its own terms, *Miranda* applies only to custodial interrogations.  Thus, *Miranda* rights need only be given to a suspect at the moment that suspect is in custody and the questioning meets the legal definition of interrogation."[78]

Defendant bears the burden of proving that his confession was obtained while he was under custodial interrogation.[79]  However, once Defendant has met that burden, "it is the Government's burden to show, by a preponderance of the evidence, that a confession was voluntary."[80]

---

[75] *United States v. Crisp*, 371 F. App'x 925, 927 (10th Cir. 2010) (unpublished) (quoting U.S. Const. amend. V).

[76] 384 U.S. 436 (1966).

[77] *Crisp*, 371 F. App'x at 927 (citing *Miranda*, 384 U.S. at 444).

[78] *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (citations and internal quotation marks omitted).

[79] *See United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986).

[80] *United States v. Pettigrew*, 468 F.3d 626, 633 (10th Cir. 2006).

A.      CUSTODY

"The Supreme Court explained in *Miranda* that an individual is 'in custody' if he is 'deprived of his freedom of action in any significant way.'"[81]

> Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police. Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, and a formal arrest—*Miranda's* custody element is triggered only in situations associated with formal arrests.[82]

The custody determination is "an objective, fact-intensive inquiry that focuses on the totality of the circumstances."[83] The Tenth Circuit has avoided adopting "hard line rules" and has instead provided the following factors to guide the Court's custody analysis: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the Defendant] aware that [he] was free to refrain from answering questions, or to otherwise end the interview."[84]

1.      POLICE -DOMINATED ATMOSPHERE

Defendant argues that he was subjected to "an overwhelming police-dominated environment as multiple officers were present in the interview room, sitting between [Defendant] and the door, and many other officers [were] surrounding him in the building."[85] The Government contends that Defendant instigated the solitary nature of his interview by insisting

---

[81] *United States v. Sanchez-Gallegos*, 412 F. App'x 58, 63 (10th Cir. 2011) (unpublished) (quoting *Miranda*, 384 U.S. at 444).

[82] *Jones*, 523 F.3d at 1239 (citing *Terry v. Ohio*, 392 U.S. 1 (1969)).

[83] *Sanchez-Gallegos*, 412 F. App'x at 63 (citing *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)).

[84] *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007).

[85] Docket No. 33, at 7.

on meeting with the agents alone and that the officers involved did not use any threatening gestures or language in their interactions with Defendant.

In determining whether the Defendant was subjected to a police-dominated atmosphere the Court considers the following factors:

> separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.[86]

Prior case law makes clear that the mere fact that a suspect is questioned in a police building is not determinative of the custody analysis.[87] That being said, "interviews taking place at the police department are more likely to be 'police-dominated.'"[88]

Here, Defendant voluntarily initiated contact with Agent Allen and requested to meet with Agent Allen at the scene of the fire. Defendant began his interaction with the officers in a public forum with only two officers present. Agent Allen testified that he and Agent Owens went to meet the Defendant in an unmarked car and that at no point during the interaction with Defendant did the agents engage the emergency lights of the vehicle.[89] Agent Allen also testified that throughout the interaction none of the officers brandished their weapons. On these facts, it is apparent that Defendant's interaction with Agent Allen and Agent Owens in the Wendy's parking lot and at the construction site were not police-dominated encounters.

After a short time at the scene of the fire, the agents requested that the conversation be moved to the Salt Lake City Public Safety Building. At the Public Safety Building, Defendant

---

[86] *Jones*, 523 F.3d at 1240.

[87] *See Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam); *United States v. Chee*, 514 F.3d 1106 (10th Cir. 2008).

[88] *Chee*, 514 F.3d at 1114.

[89] Docket No. 31, at 40.

was escorted to an interview room on the third floor. In the interview room, Defendant was usually in the company of at least three officers. Further, the officers within the room rotated out, giving the appearance of a greater number of officers on hand. Defendant was questioned in the same room for over four hours and at the end of the interview, Defendant was arrested and transported to a local jail.

During questioning, Agent Allen attested to the presence of a large number of officers in the Public Safety Building when he asked Defendant, "you saw who's out there, right?"[90] And, "you know how many agents they brought in for this?"[91] "You know everybody's working on it?"[92] Further, while Defendant was informed at the outset of the interview that he was free to leave, it is unclear whether Defendant was aware that he could exit the secure area of the Police Safety Building.

Viewing the totality of the circumstances, the Court finds that while Defendant's interaction with the agents did not begin in a police-dominated atmosphere, the nature of the interaction changed sufficiently at the Public Safety Building such that Defendant was subjected to a police-dominated encounter.

2.      QUESTIONING

The second factor looks to the nature and length of the officers' questioning and whether the questioning was accusatory or coercive. Defendant argues that this factor weighs in favor of a finding of custody because Defendant "was subject to several hours of questioning and

---

[90] Docket No. 35 Ex. 2, at 100.

[91] *Id.*

[92] *Id.*

accusatory statements from the agents."[93]  The Government contends that the agents' questioning was not accusatory or prolonged.

The agents met Defendant shortly after 6:00 pm.  The interview in the Public Safety Building commenced at approximately 7:00 pm and terminated after 11:00 pm with the Defendant's arrest.  Thus, the total interaction lasted roughly five hours and the interview at the Public Safety Building represented approximately four hours of that time.  In light of the length of the total interaction and more specifically of the interview, the Court finds that the questioning in this case was prolonged.

The accusatory or coercive nature of the agents' questioning is a closer call.  The Government argues that the agents' questions were not accusatory or coercive in a way that would make a reasonable person feel unfree to leave.  Although this may be true of Agent Allen's questions at the beginning of the interview, the record in this case demonstrates that Agent Allen's questions became more accusatory and coercive over time.  Agent Allen began by pointing out inconsistencies in Defendant's version of events and the evidence agents had recovered.  Agent Allen then put more pressure on Defendant by focusing on the evidence against Defendant and referencing all of the officers working on the case.  Agent Allen later reached a point in his questioning where he appeared to assume that Defendant started the fire and Agent Allen instead focused on why Defendant started the fire.

Investigator Poarch's questions were accusatory and coercive from the outset.  Investigator Poarch began his questioning by discussing the supposed evidence and informants he had against Defendant.  Investigator Poarch made clear to Defendant that a hundred percent of the liability was on Defendant and he was giving the Defendant one last chance to come clean.

---

[93] Docket No. 33, at 8.

When Defendant indicated to Investigator Poarch that he did not want to discuss how he burned the apartment building down Investigator Poarch responded that he needed Defendant to do so. Further, while Investigator Poarch eventually provided Defendant a partial *Miranda* warning, he did so only after receiving a complete confession from Defendant.

Agent Allen and Investigator Poarch's language, viewed in context over the course of the four-hour interview, appears to have been calculated to coerce Defendant into the resulting confession. In light of the nature and length of Agent Allen and Investigator Poarch's questioning, the Court finds that the interview was sufficiently prolonged, accusatory, and coercive in nature that a reasonable person in Defendant's position would have felt he was effectively under arrest.

3.      FREEDOM TO LEAVE

Defendant argues that he did not feel free to leave the interview because he was removed from his own vehicle and placed in an isolated interview room in a secure area of the Public Safety Building. The Government contends that "[b]ecause [Defendant] was made aware that he was free to leave, [this] factor weighs against a finding of custody."[94]

"'That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.'"[95]  *United States v. Chee* is illustrative of this principle. In *Chee*, the defendant was informed at the outset that "he was not under arrest, he was not in any trouble, he could leave if he wanted, and he did not have to talk."[96]  The defendant chose not to leave and instead

---

[94] Docket No. 34, at 14.

[95] *Jones*, 523 F.3d at 1240 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).

[96] *Chee*, 514 F.3d at 1111.

answered questions posed by two officers in an interview "that was conversational in tone and lasted less than an hour."[97]  At the end of the hour, the defendant left the station.

Similarly, in *Oregon v. Mathiason*, the Supreme Court found that an interview was not custodial where a defendant voluntarily came to a police station, "was immediately informed that he was not under arrest," and after a half-hour interview "did in fact leave the police station without hindrance."[98]

Turning to the facts of this case, it is not entirely clear whether Defendant was adequately made aware that he was free to refrain from answering questions or to otherwise end the interview.  It is undisputed that Agent Allen began the interview by advising Defendant "hey, so you know, I mean, you—you can walk out that door any time."[99]  At another point, Investigator Poarch implied that Defendant could control who was involved in the interrogation.[100]  However, at other points each of these officers implied that Defendant needed to answer questions that Defendant was uncomfortable answering.

Further, as Defendant notes, it is unclear from the record whether a reasonable person in Defendant's position would have realized that he could leave the interview room unassisted.  The interview took place in a secured area on the third floor of the Public Safety Building.  Defendant was required to pass through locked doors in the company of officers in order to arrive at the interview room.  Once in the building, Defendant was accompanied by or in the presence of officers.  Additionally, even if Defendant were to leave the Public Safety Building, he would still

---

[97] *Id.*

[98] *Mathiason*, 429 U.S. at 495.

[99] Docket No. 35 Ex. 2, at 5.

[100] *See id.* at 179.

be without his vehicle, which was left at the Wendy's parking lot. All of these circumstances would lead a reasonable person to doubt their ability to simply leave the interview.

Though not determinative of this issue, several statements made by Defendant throughout the interview call into question the assertion that Defendant felt free to leave the interview. Throughout the interview, Defendant stated his belief that he would be unable to see his family the next day, that he would lose his employment, and that he would likely spend a substantial amount of time in prison. Statements from the questioning officers served to support this belief. Agent Allen asked on multiple occasions what Defendant thought was going to occur as a result of the interview and even went so far as to ask, "do you think we're going to charge with you?"[101] After each of these questions Agent Allen did nothing to ameliorate any belief that Defendant held that he would be arrested nor did he renew his earlier statement that Defendant was free to leave.

Finally, the duration and conclusion of the interview undercut the Government's assertion that Defendant was free to leave at any time. Unlike in *Chee* or *Mathiason*, Defendant was questioned over the course of multiple hours and, at the conclusion of the interview, was arrested. In each of the cases cited above, the reviewing court noted the brevity of the interview and the fact that the defendant was not arrested at the end of the interview as key facts in their analysis.[102] Indeed, "'the Supreme Court and the lower courts have relied upon the fact that the suspect was allowed to leave following the interrogation as strong evidence that the interrogation was not custodial.'"[103]

---

[101] *Id.* Ex. 2, at 99.

[102] *Mathiason*, 429 U.S. at 495; *Chee*, 514 F.3d at 1114; *see also Jones*, 523 F.3d at 1243.

[103] *Jones*, 523 F.3d at 1233–44 (quoting 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(c) (3d ed. 2007)).

For all of these reasons, the Court finds that a person in Defendant's position would not have felt that he could terminate the interview or leave the Public Safety Building at any time.

4.     SUMMATION

After reviewing the foregoing factors, the Court finds that "[t]his case, in many respects, typifies the situation *Miranda* was meant to protect."[104]  The central theme in the Government's opposition is that Defendant's various confessions and statement were voluntary and the product of Defendant reaching out to Agent Allen to assist in the investigation of the fire.  However, the voluntary nature of Defendant's actions—including Defendant's willingness to accompany the agents and answer questions—is not determinative of the custody analysis.[105]  Rather, the question is what a person in Defendant's position would have reasonably believed.[106]  Based on the foregoing analysis, the Court finds that a reasonable person would have understood the prolonged questioning at the Public Safety Building as the functional equivalent of formal arrest.

B.     TWO-STEP INTERROGATION

A finding that Defendant was in custody during the interview at the Public Safety Building does not per se bar the admission of those statements Defendant gave after receiving a *Miranda* warning.  It is undisputed that Defendant provided two confessions after receiving complete *Miranda* warnings and one confession after receiving a partial *Miranda* warning.  A question that remains is the admissibility of the statements Defendant made after receiving *Miranda* warnings.

---

[104] *United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993).

[105] *Id.* at 1517–19.

[106] *Id.* at 1519.

1. PARTIAL WARNING

Turning first to the partial *Miranda* warning given by Investigator Poarch, this Court has

held that a partial warning is deficient and insufficient to put Defendant on notice of his rights

under *Miranda*.[107]   On this basis, the Court previously suppressed statements made as a result of

an interrogation after the provision of deficient *Miranda* warnings.[108]   In light of this precedent,

the Court will grant Defendant's Motion to Suppress as to those statements made in reaction to

Investigator Poarch's deficient *Miranda* warning.

2. WRITTEN CONFESSION

Defendant's second *Miranda* warning came at the close of his interview at the Public

Safety Building.  After Defendant confessed to lighting the fire and twice discussed the

circumstances and his actions in starting the fire with Investigator Poarch and Agent Allen, the

officers provided Defendant a written *Miranda* warning that they asked Defendant to sign.  The

officers also asked Defendant at that time to supply a written version of his confession.

Defendant asked that an officer write the confession and relayed an abbreviated version of the

events he had already discussed with Investigator Poarch and Agent Allen.

This factual pattern is not unprecedented.  The United States Supreme Court addressed

similar two-step interrogation techniques in *Oregon v. Elstad*[109] and *Missouri v. Seibert*.[110]

The Court first considered this issue in *Elstad*.  In that case, police officers briefly

questioned a burglary suspect in his home prior to transporting him to the police station.  The

officers did not provide the suspect *Miranda* warnings.  After an hour at the police station, the

---

[107] *See United States v. Vincent*, No. 2:08-CR-252 TS, 2008 WL 5049291, at *1 (D. Utah Nov. 25, 2008).

[108] *Id.*

[109] 470 U.S. 298 (1985).

[110] 542 U.S. 600 (2004).

officers joined the suspect in an office and for the first time provided him *Miranda* warnings, reading from a standard card. The suspect "indicated he understood his rights, and, having these rights in mind, wished to speak with the officers."[111] The suspect then provided a full statement that was initialed and signed by him and the officers. The suspect conceded that no threats or promises of leniency were made to him by the officers.

> The Court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." It rejected the theory that the initial, unwarned statement creates a "lingering compulsion" based on "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement," the Court found that "subsequent administration of *Miranda* warnings ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[112]

In *Seibert*, "the police 'used a two-step questioning technique based on a deliberate violation of *Miranda*.' The interrogating officer began questioning the suspect without providing the *Miranda* warnings; after the suspect confessed, the officer gave the warnings and resumed the questioning to lead the suspect back over the same ground."[113] In so doing, the officers confronted the suspect with her pre-warning statements. "The Court found that the interrogating officers had withheld the *Miranda* warnings from the suspect to obscure both the practical and legal significance of the admonition when finally given and that the interrogation reflected a strategy 'dedicated to draining the substance out of *Miranda*.'"[114]

---

[111] *Elstad*, 470 U.S. at 301.

[112] *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1149 (10th Cir. 2006) (quoting *Elstad*, 470 U.S. at 309, 314).

[113] *Id.* (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring in the judgment)).

[114] *Id.* (quoting *Seibert*, 542 U.S. at 617 (plurality opinion), 620 (Kennedy, J. concurring in the judgment)).

"Although the Court held that statements obtained through such a two-step technique are inadmissible, none of the opinions in *Seibert* received the votes of five Justices."[115]  The plurality opinion, which garnered the votes of four justices, held that "[t]he threshold inquiry when interrogators question first and warn later is . . . whether it would be reasonable to find that . . . the warnings could function 'effectively' as *Miranda* requires."[116]  The plurality established five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective":

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second [rounds], [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.[117]

"These factors, all of which concern the relationship between the first and second interrogations, are intended to aid courts in determining whether an initial, unwarned interrogation operated to 'thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted.'"[118]

"Justice Kennedy concurred in the judgment, but on what he described as 'narrower' grounds."[119]  "Justice Kennedy proposed an intent-based test that would apply only when 'the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.'"[120]  Under this approach, "[t]he admissibility of postwarning statements should

---

[115] *Id.* at 1150.

[116] *Seibert*, 542 U.S. at 611–12.

[117] *Id.* at 615.

[118] *Carrizales-Toledo*, 454 F.3d at 1150 (quoting *Seibert*, 542 U.S. at 617).

[119] *Id.*

[120] *Crisp*, 371 F. App'x at 931 (quoting *Seibert*, 542 U.S. at 622).

continue to be governed by the principles of *Elstad*," unless the police used "the two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning."[121]

"Ordinarily, where 'a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"[122] However, this "rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions.'"[123]  The Tenth Circuit has noted that "[w]hen the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning,' then [this rule] becomes 'problematic.'"[124]

Justice Kennedy's opinion in *Seibert* may appear to be the position of "those Members who concurred in the judgment[] on the narrowest grounds."[125]  However, "determining the proper application of the [the narrowest grounds] rule to *Siebert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."[126]  This is potentially the case because "three of the four Justices in the plurality and the four dissenters decisively rejected any subjective test based on deliberateness on the part of the police."[127]

---

[121] *Seibert*, 542 U.S. at 622.

[122] *Carrizales-Toledo*, 454 F.3d at 1151 (quoting *Marks v. United States*, 430 U.S. 188 (1977)).

[123] *Id.* (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991)).

[124] *Id.* (quoting *King*, 950 F.2d at 781, 782).

[125] *Marks*, 430 U.S. at 193.

[126] *Carrizales-Toledo*, 454 F.3d at 1151.

[127] *Id.* (citation and internal quotation marks omitted).

While the Tenth Circuit recognized the difficulty of this issue in *Carrizales-Toledo*, it declined to "determine which opinion reflects the holding of *Seibert*" because in *Carrizales-Toledo* the defendant's statements "would be admissible under the tests proposed by the plurality and by the concurring opinion."[128]

In the instant case, the admissibility of Defendant's written confession turns on which of the opinions reflects the proper holding of *Seibert*.  Defendant's written confession, provided during the latter part of his interview on February 14, 2014, bears many similarities to the confession at issue in *Seibert*.  The five factors outlined by the plurality highlight these similarities.

First, Agent Allen and Investigator Poarch were exhaustive and complete in the detail of the questions and answers they obtained from Defendant prior to advising him of his *Miranda* rights.  Unlike *Elstad*—where the officers asked a few general questions at the suspect's home before taking him to the station—here the officers spent multiple hours inquiring into the specific details regarding Defendant's conduct giving rise to the offense.   Second, the content of the written confession mirrored Defendant's pre-*Miranda* statements.  Indeed, the written confession was treated as a summary or recitation of the earlier statements.  Third, as in *Seibert*, both confessions were obtained in the same interview room.  In this instance, Defendant was not even allowed a break prior to being asked to sign the *Miranda* warnings and provide a written account of his confession.  The fourth factor is the only factor that cuts against a finding that Defendant's midstream *Miranda* warning was ineffective.  The written *Miranda* warnings were administered by an officer that had been present in the interview room during the interview but who had not directed the questioning of Defendant previously.  The same officer recorded the written

---

[128] *Id.*

confession. The fifth factor is particularly on point, as the officers and Defendant both treated the creation of the written statement as continuous with Defendant's earlier verbal confession.

The majority of these factors support a finding that the officers' provision of the written *Miranda* warning was ineffective. Thus, under the test set out by the plurality in *Seibert*, the Court finds that the unwarned interrogation "operated to 'thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted'" [129] and the subsequent written confession is therefore inadmissible.

On the other hand, under the subjective test proposed by Justice Kennedy, it is likely that the confession would be admissible. There is no direct evidence in the record that the officers intended to use the two-step interrogation technique in a calculated way to undermine the purposes of *Miranda*. Without such evidence, the Court is to apply the voluntariness test of *Elstad*. The voluntariness of a confession is determined "based upon the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation. No single factor is determinative." [130]

> Courts typically consider five factors in a voluntariness inquiry: (1) the age, intelligence, and education of the defendant; (2) the length of any detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his or her constitutional rights; and (5) whether the defendant was subjected to physical punishment. [131]

Here, Defendant is an adult and while there is no evidence in the record as to Defendant's education, he is gainfully employed in a skilled profession, that of an electrician. Based on Defendant's answers to the questions posed during the interview, he does not appear to suffer

---

[129] *Id.* at 1150 (quoting *Seibert*, 542 U.S. at 617).

[130] *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citations and internal quotation marks omitted).

[131] *Crisp*, 371 F. App'x at 932.

from any intellectual deficiencies. The detention was moderately long, lasting over four hours. The questions posed at times were aggressive, however, the overall tone of the interview was cooperative and Defendant was not verbally abused. Defendant was eventually advised of his constitutional rights and was not subjected to physical punishment in any form.

Defendant was cooperative and willing to engage throughout the interview. Though the length of the interview in combination with the nature of the questioning gives rise to some concern, the Court finds that Defendant's second confession was voluntarily given. Therefore, under the test set out in Justice Kennedy's opinion, the Court finds that Defendant's written confession would be admissible.

Because of these differing results, the resolution of Defendant's Motion requires a determination as to which test from *Seibert* the Court should apply. In a recent opinion of this Court—*United States v. Archuleta*[132]—Judge Waddoups analyzed *Seibert* and decided "to apply the fuller standard of the plurality."[133] This Court is persuaded by the reasoning of *Carrizales-Toledo* and the holding of *Archuleta* and will therefore apply the five-factor test set out by the plurality. For this reason, the Court will grant Defendant's Motion as to his written confession.

3.    SALT LAKE COUNTY JAIL

The remaining issue is the admissibility of Defendant's statements made in the Salt Lake County Jail on February 15th. The officers who questioned Defendant at the jail began by advising Defendant of his *Miranda* rights. Because the *Miranda* warning came after Defendant had confessed during the interview of the preceding night, the Court once more must determine whether the "initial, unwarned interrogation operated to 'thwart *Miranda's* purpose of reducing

---

[132] 981 F. Supp. 2d 1080 (D. Utah 2013).

[133] *Id.* at 1091, 1095–96.

the risk that a coerced confession would be admitted.'"[134]  In keeping with the foregoing

analysis, Court will apply the five-factor test set out by the plurality in *Seibert*.

As discussed above, the first factor cuts against the Government because the unwarned

interrogation resulted in a complete and detailed series of questions and answers.  However,

under the second factor, the content of the jail discussion does not entirely overlap with that of

the unwarned interrogation.  In the jail interrogation, Defendant disclaims ever lighting a fire to

burn insulation off of wire.  Rather, Defendant states that he intentionally set the fire because he

was high and may have been motivated to see the fire department's response.  Thus, while the

two interrogations covered similar grounds—Defendant's activities on the night of the fire—

Defendant's statements differed from the night before.

Third, the timing and setting are distinct.  The jail interrogation occurred the day after the

unwarned interrogation and the interviews took place in different locations.  Fourth, the only

constant in the continuity of police personnel was Agent Allen.  The two other officers that

attended the jail interview were other agents from ATF who disclaimed involvement in the

interview of the night before.  Further, while Agent Allen was present during the jail interview,

he did not lead, nor was he heavily involved in the questioning.

The fifth factor addresses the degree to which the interrogators' questions treated the jail

interview as continuous with the unwarned interview in the Public Safety Building.  Agent Robin

began the jail interview by indicating to Defendant that he and Agent Claflin "are scene guys."[135]

Agent Robin stated that they had been over at the scene of the fire digging and "didn't have

much to do with the interviews."[136]  A few of Agent Robin's questions naturally referred back to

---

[134] *Carrizales-Toledo*, 454 F.3d at 1150 (quoting *Seibert*, 542 U.S. at 617).

[135] Docket No. 35 Ex. 3, at 3.

[136] *Id.*

the interview and confession of the night before. For example, after reading Defendant his rights, Agent Robin began by asking, "Can you go—just go through it with us one more time from, you know, (inaudible), what you did."[137] However, the far majority of the questions treat the jail interview as a new conversation based on information the Agents obtained in digging through the fire scene.

Balancing the foregoing factors, the Court finds that the unwarned interrogation did not act to thwart the purposes of the *Miranda* warning provided by the agents prior to the jail interview. While subjectively Defendant may have felt constrained by the statements made the night before, the Court finds that an objective person in Defendant's position would have understood the effect of the *Miranda* warnings provided by the Agents prior to questioning Defendant at the Salt Lake County Jail.

III. CONCLUSION

Based on the foregoing, the Court will grant Defendant's Motion as to the statements and written confession provided by Defendant at the Public Safety Building and deny Defendant's Motion as to the statements made as a result of interrogation at the Salt Lake County Jail. It is therefore

ORDERED that Defendant's Motion to Suppress Statements (Docket No. 25) is GRANTED IN PART AND DENIED IN PART.

DATED August 13, 2014

BY THE COURT:

TED STEWART
United States District Judge

---

[137] *Id.* at 5.

33